Frank **STEVENSON** and Rebecca Harshberger, Administratrix of the Estate of Mary E. Stevenson, Deceased, Plaintiffs,

v.

**UNION PACIFIC RAILROAD COMPANY, Defendant.**

**No. 2:99–CV–00160 WRW.**

United States District Court,
E.D. Arkansas,
Helena Division.

July 19, 2001.

B. Michael Easley, Easley, Hicky, Cline & Hudson, Forrest City, AR, Robert L. Pottroff, Myers, Pottroff and Ball, Manhattan, KS, Stephen W. Boyda, Attorney at Law, Marysville, KS, for plaintiffs.

Scott H. Tucker, Joseph Patrick McKay, Friday, Eldridge & Clark, Susan Childers, Wilkes & McHugh, P.A., Little Rock, AR, for Union Pacific Railroad Company.

Edwin L. Lowther, Jr., Wright, Lindsey & Jennings, Little Rock, AR, Elizabeth W. Fleming, Daniel A. Silien, Preston/Gates/Ellis & Rouvelas/Meeds LLP, Washington, DC, for Operation Lifesaver, Inc.

## AMENDED ORDER IMPOSING SANCTIONS AGAINST DEFENDANT UNION PACIFIC RAILROAD COMPANY

WILSON, District Judge.

Pending are Plaintiffs' Motion for Sanctions and Supplemental Motion for Sanctions, docket numbers 111 and 132. The parties briefed the issues and presented evidence at hearings on February 16, March 5, and March 6, 2001. The parties subsequently provided additional briefs and affidavits. The issues, having been fully briefed and argued, are ripe for decision.

### I. Discussion of Sanctions in General

■ "Sanctions may be imposed against a litigant who is on notice that documents and information in its possession are relevant to litigation, or potential litigation, or are reasonably calculated to lead to the discovery of admissible evidence, and destroys such documents and information." *Dillon v. Nissan Motor Co.*, 986 F.2d 263, 267 (8th Cir. 1993) (quoting Jamie S. Gorelick, et al., Destruction of Evidence § 3.11 (1989 and Supp. 1990)). "Before a sanction for destruction of evidence is appropriate, however, there must also be a finding that the destruction prejudiced the opposing party." *Id.*

The Eighth Circuit has set out three additional considerations in the case of destruction of records carried out under a document retention policy. *Lewy v. Remington Arms Co.*, 836 F.2d 1104, 1112 (8th Cir.1988). This is not a three-part test where each factor must be met, but rather three factors to be considered in determining whether sanctions should be imposed. First, was the document retention policy "reasonable considering the facts and circumstances surrounding the relevant documents"? *Id.* Second, did the litigant know, or should it have known, that the documents would become material and, thus, should be preserved? Finally, was the policy instituted in bad faith? *Id.*

■ Sanctions serve a dual function. Their purpose is "not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent." *Nat'l Hockey*

*League v. Metropolitan Hockey Club, Inc.,* 427 U.S. 639, 643, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976). Sanctions have included, among others, fines; award of reasonable attorneys' fees and expenses; disqualification of counsel; preclusion of claims or defenses or evidence; a spoliation instruction; dismissal of the action; and entry of default judgment. *See* Sanctions, The Federal Law of Litigation Abuse—Inherent Power: Bad Faith Litigation Abuse, § 28(A), p 450 (3d ed. Gregory P. Joseph ed., 2000).

## II. Voice Tapes

### A. *Was evidence destroyed?*

Union Pacific Railroad Company ("UP" or "Defendant") tapes communications between train crews and dispatchers. These tapes are kept for 90 days and then reused, i.e., new communications are recorded over the old communications. The dispatch tape from the date of the Plaintiffs' accident[1] has been recorded over; thus, the evidence has been destroyed.

### B. *Was the evidence discoverable?*

■ UP argues the tape did not contain discoverable information. Yet, Mr. John Reininger, Director of Dispatching Practices and Quality Assurance for UP, testified during the March 5 hearing that the dispatch tape would have contained the train crew's initial description of the accident. Additionally, Defendant presented a letter from Gregory A. Likness, of the Federal Railroad Administration, in which Mr. Likness discussed the purpose of recording dispatcher communications. He stated:

> The practice while common in the industry, is based on internal policies or practices and is *highly advantageous in* monitoring rule compliance and *event reconstruction.*

Exhibit G to Defendant's Supplemental Brief on Plaintiffs' Motion for Sanctions (doc. no. 162) (emphasis added).

At my request, Defendant submitted, for an *in camera* review, cassette tapes of dispatch communications from the last ten grade crossing accidents occurring before the hearing on March 5, 2001, and recorded at the Harriman Dispatch Center. I requested these specific tapes during the March 5, 2001 hearing to give me examples of what is routinely recorded. After listening to the tapes, *in camera,* I am convinced that the "destroyed" tape contained discoverable information (information that is relevant or reasonably calculated to lead to the discovery of relevant evidence). The sample tapes contained the train crews' descriptions—albeit generally brief ones—of accidents. The dispatcher typically asks whether anyone was hurt and what damage was done to the train. The train crews' responses sometimes indicate how well the train crew could see a vehicle struck by the train. On one tape, the train crew indicated that, due to weather-reduced visibility, they could not see the vehicle the train struck until it was about 100 feet from it. How well and when the train crew first saw the vehicle is important because it may shed light on whether the train crew was keeping a proper lookout, whether it had a duty to slow the train, etc. If, for example, the crew had not slowed the train because of weather-reduced visibility, a speed issue might arise.

Also, dispatchers make sure emergency medical services and local law enforcement personnel are notified of the accident. The dispatchers coordinate various UP personnel who respond to the accident scene; communications between dispatchers and some of these individuals are recorded. The identities of these witnesses are relevant and discoverable.

It seems probable that these tapes would not often reveal a "smoking gun," but, based upon the tapes I heard, upon common sense, and upon the statements of Mr. Reininger and Mr. Likness, they usually reveal significant information that is useful in developing a case (from plaintiffs' and defendants' points of view).

### C. *Were Plaintiffs Prejudiced?*

■ Plaintiffs were prejudiced by the destruction of this evidence. No other rec-

---

1. Although there are several tapes made each day, only one of these would have contained the transmissions between the train crew and dis-patcher assigned to the train which struck Plaintiffs' vehicle. All references to "the tape" (singular) are to this tape.

ords—oral or written—of the train crew's comments or observations were made contemporaneously with the accident. Plaintiffs' counsel were unable to interview the train crew at the time of the accident, and memories tend to fade, or are colored, with the passage of time. The crew's present sense impressions and many of the details may well be lost forever. Contemporaneous statements are "unique catalysts in the search for truth." 8 WRIGHT, MILLER & MARCUS, FEDERAL PRACTICE · AND PROCEDURE: CIVIL 2d § 2025, at 385 n. 28 (1994) (quoting *Southern Ry. Co. v. Lanham,* 403 F.2d 119, 128 (5th Cir.1968), and *Johnson v. Ford,* 35 F.R.D. 347, 350 (D.Colo.1964)).

Additionally, although Plaintiffs have been able to discover the identity of witnesses who investigated the scene of the accident immediately after the accident, the discovery of this information has taken additional time and involved additional expense.

Further, a lawyer, familiar with the issues and details of his clients' accident, might glean other important details from the dispatch tape. (The significance of these details might well escape the attention of a judge who usually is not as well versed as the lawyers in the specifics of the case).

### D. Additional Factors to be Considered Where Destruction Was Done Pursuant to a Document Retention Policy.

■ Because these tapes were destroyed (taped over) pursuant to a document retention policy, it is necessary to consider whether the document retention policy is reasonable; whether it was instituted or continued in bad faith; and whether Defendant knew or should have known the tapes would become material and, thus, should have been preserved despite the document retention policy. *See Lewy,* 836 F.2d at 1112.

■ John Reininger, Director of Dispatching Practices and Quality Assurance for UP, testified that the purpose of taping conversations between crew members and dispatchers is to monitor the job performance of dispatchers and to resolve any question about movement authority that might arise. He

testified that those activities can easily be accomplished within the 90 days for which the tapes are retained. According to the Federal Railroad Administration, the national average number of days for retention of dispatch tapes is 30 days. *See* Exhibit G to Defendant's Supplemental Brief on Plaintiffs' Motion for Sanctions (doc. no. 162).

While the cost involved in storing tapes is negligible, the business purpose for which the tapes are made is fulfilled within the 90 days for which they are kept. I have no evidence to suggest that the document retention policy—in general—is unreasonable or that it was instituted in bad faith. However, according to the Eighth Circuit, that does not relieve Defendant from the burden of preserving documents that are relevant to litigation, or potential litigation, or are reasonably calculated to lead to the discovery of admissible evidence:

> Even if the court finds the policy to be reasonable given the nature of the documents subject to the policy, the court may find that under the particular circumstances certain documents should have been retained notwithstanding the policy. For example, if the corporation knew or should have known that the documents would become material at some point in the future, then such documents should have been preserved.

*Lewy,* 836 F.2d at 1112.

When there is a death or serious injury in a collision, the Defendant *knows* within reason that a personal injury or death claim may be made. This Defendant, over many years, has been regularly involved in grade crossing collisions and litigation. It has to know within reason that claimants and their lawyers will request all information available under the Federal Rules of Civil Procedure. This is a matter of common sense, but even if it were not, Defendant *knows* this from years of experience.

One can conclude without hesitation that destroying these taped conversations is unreasonable. Without ever hearing one of these conversations, common sense dictates the conclusion that contemporaneous statements by eye witnesses to a collision will contain at least some information of interest

to parties who wish to establish or deny fault (or to establish or contest the cause and extent of injuries). The ten tapes I listened to confirmed this intuition.

UP *knows* the tapes may well contain material evidence. Brent Mower, a former UP employee, testified that when he was working in UP's Claims Department in 1992, it was standard practice to preserve the voice tape where a serious accident had occurred. UP's current Claims Representatives testified that they did not know of this standard practice. However, UP's Research Request Form—a form which the Claims Representatives use to request certain data be preserved or pulled for their review[2]—has seven boxes which may be checked. The first box is labeled "Voice Tape." *See* Plaintiffs' Exhibit 40.

Mr. Chris Skinner, Manager of Systems Development and Maintenance at the Harriman Dispatch Center, testified in a deposition that he had been asked on occasion to preserve tapes. *See* Plaintiffs' Exhibit 38, Deposition of H.C. Skinner, pp. 95–96. He could not say how often, but agreed that he had been requested to do so by claims agents several times over the past six years. *Id.*

Considering the materiality of the tape, and UP's knowledge of that materiality, I can see no reason to adhere to a 90–day retention policy when there has been a serious injury or death, other than to keep the voice tape out of the hands of Plaintiffs.

On November 1999, just one year after the Plaintiffs' accident, a tractor trailer owned by Triumph Trucking became high centered on a track crossing in Piggott, Arkansas, and a UP train was derailed. UP filed a lawsuit against Triumph Trucking within days. *See Union Pacific R.R. Co. v. Triumph Trucking Co., et al.*, Case No. 4:99CV00865 HDY.[3] One

of the fact questions in the lawsuit involved what notice the train crew had that the tractor trailer was on the tracks, and UP, as plaintiff in that case, preserved both the dispatch voice tape and a tape of a conversation between the sheriff's office and the Union Pacific Risk Management Communication Center (RMCC) in St. Louis, Missouri ("RMCC voice tape").[4] UP went on to introduce the RMCC voice tape into evidence at trial. Can one not reasonably infer that when UP believes the voice tape is favorable, it preserves it?

It would be quite simple to preserve the tapes when an accident involving death or serious injury has occurred (until there is no longer a reasonable possibility of a lawsuit). The 90–day period may well be reasonable in other cases, but under these circumstances, it is manifestly unreasonable, and adherence to the retention policy amounts to bad faith.

After considering and weighing all the factors, I believe that sanctions are in order for the destruction of this evidence. The sanctions to be imposed will be discussed later in this opinion.

## III. Track Inspection Records

### A. Was evidence destroyed?

■ The Federal Railroad Administration (FRA) requires UP to inspect its tracks and to keep the records of these inspections for "*at least* one year." *See* 49 C.F.R. § 213.241(b) (emphasis added). It is UP's policy to keep these records for the minimum amount of time required by the FRA (one year), and then destroy them. For example, after the July, 2001 inspections are completed, Bruce Brown, the Director of Track Maintenance, would pull and destroy the records from July 2000, and replace them with the records for July 2001. Thus, at any

---

**2.** Since I first issued this Order on July 17, 2001, defense counsel has written indicating that UP's research request form is not in the control of claims representatives, but is in a computer database that employees at the Harriman Dispatch Center use to document the various items requested by claims representatives. Either way, the existence of the check box labeled "Voice Tape" on this form, indicates that voice tapes are a standard item which may be requested, and that they are, or at least that they were at one

point, requested with enough regularity that they merited a check box of their own.

**3.** The case was tried on April 23–26, 2001, before United States Magistrate Judge H. David Young.

**4.** Although I do not know the specific retention policy for RMCC voice tapes, Defendant's counsel has stated that RMCC voice tapes are not routinely preserved.

given point, there are only 12 to 13 months of track inspection records available.

Plaintiffs' accident occurred in November, 1998. At that time, track inspection records for November 1997 through November 1998 were available. UP, however, made no efforts to preserve these records, but rather continued to destroy them—pursuant to its document retention policy. This lawsuit was filed in September, 1999, and on October 25, 1999, Plaintiffs served UP with interrogatories and requests for production, requesting copies of UP's track inspection records for the 24–month period preceding and including the date of the Plaintiffs' accident. At the time of the request, records for October and November 1998 were available. But, UP made no efforts to preserve these records, and continued their destruction—pursuant to its document retention policy—despite the fact that a formal request for the records was pending.

Plaintiffs and Defendant agreed on an extension of time for UP to respond to the discovery requests, making the responses due on January 10, 2000. UP's counsel did not send the discovery requests to UP's claim agent, Eddie Fuller, until November 17, 1999. At the time Mr. Fuller received the requests, only the records for November 1998 were still available.

Because of a major derailment on November 20, and Mr. Fuller's vacation in November 1999, he did not begin looking for the records requested by Plaintiffs until December 1999. Meanwhile, UP destroyed the records from November 1998—pursuant to its document retention policy.

Furthermore, Defendant did not inform Plaintiff that the records had been, and were being, routinely destroyed. Mr. Fuller testified that because this was his first grade crossing collision case with UP, he did not know where the track inspection records were kept. He testified about where he looked for them and that he was unable to locate them by the time the discovery responses were due on January 10, 2000. UP responded to Plaintiffs' discovery requests stating that it was looking for the records and would produce them as soon as possible.

On June 23, 2000, Plaintiffs deposed Bruce Brown, Director of Track Maintenance. Mr. Brown finally explained UP's track inspection record retention policy to Plaintiffs, and Plaintiffs immediately requested copies of all track inspection records. Mr. Brown produced records for May 1999 to April 2000. By that time, all other records—including those from the month of the accident—had been destroyed.

### B. Was the evidence discoverable?

■ Plaintiffs have alleged that the condition of the crossing contributed to the accident. The inspection records—reflecting the condition of the tracks and the crossing—were clearly discoverable.

### C. Were Plaintiffs prejudiced?

■ Plaintiffs complain that a board on the crossing was loose and that this caused a distraction for crossing motorists. Plaintiffs assert that this defect would have been noted on the track inspection records. Plaintiffs have presented the deposition testimony of Ed Martin, one of Defendant's track inspectors. Mr. Martin stated that he would have noted a defect such as a loose board on the crossing on the track inspection record.

Mr. Brown, Director of Track Maintenance, testified that Mr. Martin was not a track inspector at the time of the accident, and that the only defects which UP records on its track inspection records are those required to be reported by the FRA. Defendant argues Plaintiffs were not prejudiced because the type of defects of which Plaintiffs are complaining are not the type of defects which are required to be reported by the FRA.

However, Mr. Brown had no memory of conveying this fact (that inspectors should only record FRA defined defects) to track inspectors for several years. Furthermore, according to Mr. Martin's deposition testimony, a track inspector today noting this type of defect might well include it in the track inspection report. If such a defect was not noted in the report, it might imply that UP was unaware of the problem—which, of course, raises the issue of whether UP should have known of the problem.

For defects which are noted on the track inspection records, UP is required to note remedial actions taken to remedy the defects on the same records. Plaintiffs have been prejudiced by being denied evidence of UP's knowledge and awareness of alleged defects at the time of the accident and any subsequent remedial measures it might have taken. (Although the latter might not be admissible at trial under the Federal Rules of Evidence, these measures could reveal other admissible evidence—and they might be admissible under one of the exceptions to Federal Rule of Evidence 407.)

### D. Additional Factors to be Considered Where Destruction Was Done Pursuant to a Document Retention Policy.

Because the track inspection records were destroyed in accordance with UP's document retention policy, it is necessary to consider whether the retention policy is reasonable, whether it was instituted or continued in bad faith, and whether UP knew or should have known the documents were material. *See Lewy*, 836 F.2d at 1112.

■■ UP only keeps track inspection records for the minimum time required by the FRA. The FRA does not require that the records be destroyed after a year has expired; it simply requires they be maintained for "at least" a year. *See* 49 C.F.R. § 213.241(b). Failure to comply with the FRA's one-year retention requirement would be unreasonable, per se; but it does not follow that compliance with the bare minimum one-year retention is necessarily reasonable.

■■ In *Lewy*, the Eighth Circuit suggested that a three-year document retention policy might be sufficient for documents such as appointment books or telephone messages, but inadequate for documents such as customer complaints. *Lewy*, 836 F.2d at 1112. This is because customer complaints may reveal defects. Similarly, track inspection records may reveal defects in rails and crossings. When an accident occurs—especially when the accident involves death or serious injury—and the condition of the crossing is an issue—track inspection records are rele-

vant. All available track records should be maintained from the time of the accident until there is no longer a reasonable possibility of a lawsuit.

Even though I do not believe the policy is reasonable, I am not persuaded that the policy was instituted in bad faith. As with the voice tape, however, UP knew or should have known that the documents would become material and it should have preserved them.

UP claims that it was unaware of the request for the records until sometime in November, 1999 (when Defendant's counsel sent the requests to the Claims Agent), and that it was unable to find the records before they were destroyed. But, UP had notice that these records were relevant from the day of Plaintiffs' accident; knew that this type of record had been requested in prior lawsuits; and knew that the track inspection records contain information about defects and structural problems with the railway which might shed light on the cause of the accident. At the very latest, UP was on notice that these records were relevant when its counsel received he requests for production in October, 1999.

After considering and weighing all the factors, I believe that sanctions are in order for the destruction of this evidence. The sanctions to be imposed will be discussed later in this opinion.

### IV. Concealment or Destruction of Complaints

On October 25, 1999, Plaintiff requested information about lawsuits, claims, or other complaints Defendant had received about the crossing at issue. Defendant objected on the basis of privilege, and on December 29, 2000, I ordered Defendant to produce limited information about prior crossing collisions.

### A. 1992 Accident

■■ Plaintiffs complain that a claims file for an accident which occurred at this crossing in 1992 was improperly destroyed. The destruction occurred after the Plaintiffs' accident, but before the filing of Plaintiff's lawsuit. The file was destroyed pursuant to a

six-year document retention policy, and Defendant had a good faith belief that the contents of the file were privileged at the time the file was destroyed. Further, I am not convinced that Plaintiffs were unduly prejudiced by the destruction of the file. The two accidents occurred six years apart, and I have no evidence to indicate that the accidents were similar. Thus, I do not believe that sanctions are appropriate for Defendant's destruction of the 1992 claims file.

### B. 1999 Accident

Plaintiffs assert that Defendant should have disclosed evidence of a claim which occurred at this crossing in 1999, several months after Plaintiffs' accident. Defendant argues the information was not disclosed because it interpreted the request to be for information about "crossing collisions." The request clearly asks for "claims involving the crossing . . . ."

However, no evidence was destroyed, and Plaintiffs now have information about the claim. I see no prejudice to Plaintiffs which merits sanctions.

### C. Other Complaints

Plaintiffs assert that they have identified eight witnesses who purport to have made complaints about the crossing to UP and that none of these complaints were disclosed by UP. UP contends that it has no record of these eight complaints. Because there is no proof that Defendant has concealed these complaints, sanctions are not appropriate.

## V. Event Recorder Evidence

Plaintiffs argue Defendant has not provided accurate and timely information and evidence on the data event recorders on the trains. Plaintiffs contend that the prejudice they have suffered is "the delay and cost necessitated by not being able to trust any discovery as truthful and complete." See Plaintiffs' Outline Brief in Support of Plaintiffs' Motion for Sanctions.

The evidence shows that Defendant objected to producing the amount of data requested by Plaintiffs. Plaintiffs voluntarily narrowed their request, instead of contacting the Court, and Defendant provided what Plaintiffs requested. Plaintiffs then asked for more information and Defendant produced that. Eventually, despite Defendant's original objections, Defendant produced all of what Plaintiffs requested.

Although Defendant's objections to Plaintiffs' discovery may have made the process of extracting the information somewhat tedious, I do not see any prejudice to Plaintiffs worthy of sanctions.

## VI. Witness Identities

In October 1999, Plaintiffs requested the identities of UP personnel who regularly conducted any on-site work at the crossing. Defendant argues that its data system will not retrieve the specific information requested by Plaintiffs. The system will identify groups of people (called "gangs") that have worked on 45–mile stretches of track, but not specific crossings. During the March 5 hearing, Defendant was ordered to produce the identities of gangs that have worked on the 45–mile stretch of track which includes the crossing at issue.

In essence, Defendant failed to produce any information to Plaintiffs because, in order to respond, it would have had to provide more information than Plaintiffs requested. Defendant's position on this point is paper thin, but Plaintiffs now have the information they requested, and I will not impose sanctions at this time. Defendant is cautioned, however, that it should read discovery requests as they ought, in fairness, be read, so that it will not have to rely upon technical wording as a defense to non-production.

## VII. Mechanical Records

One of Plaintiffs' allegations is that the locomotive's defects were sufficient to cause a distraction to the crew. On October 25, 1999, Plaintiffs propounded discovery requests to Defendant which included a request to produce "[m]aintenance records for the calendar year preceding this collision on the locomotives involved (including records as to the horn)." See Plaintiff's Motion for Sanctions Exhibit # 3, Request for Production No. 5. Defendant responded in January 2000,

that "[t]his information has been requested and will be provided to counsel upon receipt." *Id.* A computer printout of the mechanical history of the locomotives was then attached to the responses. No further information was provided to Plaintiffs.

Plaintiffs issued a notice of deposition and subpoena duces tecum for Bill Jacobs, requesting all maintenance records. Mr. Jacobs, however, failed to bring all of the requested documents to his January 11, 2001 deposition. Instead, he asserted that maintenance records (called "work packets") are kept at the particular workshop that does the work, and that requests for those records have to be made individually to the workshops. UP has a 13-month document retention policy for work packets.

Defendant's counsel argues that neither he nor Mr. Fuller, Defendant's claims agent, knew of the existence of the work packets until after the 13 months had passed—and the requested records (with few exceptions) [5] have been destroyed. If this motion for sanctions were levied personally against Defendant's counsel or Defendant's claims agent, their lack of knowledge might be relevant. However, this motion for sanctions is directed to UP.

Defendant's counsel and claims agent are agents for Defendant. Upon receipt of the discovery request, they were charged with the responsibility of locating and producing maintenance records. It is logical that they would contact Mr. Jacobs, the person responsible for maintenance, to inquire about the existence and location of all maintenance records. They should then have issued the specific requests to the individual workshops, obtained the records, and provided them to Plaintiffs. Instead, Defendant provided a summary and made no apparent effort to locate mechanical records.

Plaintiffs have shown that the summary is fallible. One of the work packets produced by Defendant showed that about nine days before the accident, the lead locomotive had been deemed non-compliant and was subsequently repaired. This non-compliance and

subsequent repair were not noted on the computer summary. However, I have no evidence to suggest this was an intentional spoliation of evidence, and there is nothing else that indicates there were mechanical problems with the locomotives at the time of the accident.

Although I have no evidence before me to suggest that a 13-month document retention policy for work packets is not generally reasonable, or that the policy was instituted in bad faith, I do believe that Defendant knew the documents were material from the moment Defendant received Plaintiffs' Request for Production, and it was under an obligation to produce the records. Based on this alone, I would seriously consider imposing a sanction against Defendant if Plaintiffs had been able to show they were prejudiced by the destruction of these records. Because Plaintiffs have not shown by a preponderance of the evidence that they have been prejudiced, I will not issue sanctions for Defendant's destruction of this evidence.

## VIII. Photos of the Accident Scene

■ Defendant took photos of the accident scene five weeks after the accident. Plaintiffs argue the vegetation was "lowered" before the pictures were taken. If Defendant wishes to use these photos at trial, Plaintiffs may dispute their accuracy at that time. Plaintiffs have not been prejudiced.

## IX. Chemical Spray Pattern Drawing

■ Defendant had a vegetation control contract with Asplundh, effective from February 1, 1998 to March 31, 2000. The contract refers to a chemical spray pattern drawing. Defendant has been unable to produce that drawing. Further, UP represents that it has contacted Asplundh, and that Asplundh is unable to locate a copy of the drawing. Defendant argues it cannot produce what it does not have.

No one argues that the drawing is not relevant. Vegetation and visibility are key issues in this case. The question is whether Plaintiffs have proven by a preponderance of the evidence that they have been prejudiced.

---

5. Defendant was able to locate a few packets and produced these to Plaintiffs on February 14, 2001, two days before the hearing on Plaintiffs' Motion for Sanctions, and one month after the deposition of Mr. Jacobs.

Plaintiffs have located a chemical spray pattern drawing attached to an unrelated vegetation control contract of the Defendant which, Plaintiffs assert, does not comply with Arkansas law. Plaintiffs ask that the jury be told it can infer the Defendant did not produce the drawing in this case because it does not comply with Arkansas law. However, Plaintiffs' drawing sheds no light on whether the drawing at issue would comply with Arkansas law. Plaintiffs have not shown that they have been prejudiced.

## X. Sanctions

■ I have given the issue of sanctions serious consideration. I am disturbed by the apparent lack of communication and cooperation within Defendant's organization. Documents have been routinely destroyed despite Defendant's knowledge that they are relevant to this lawsuit. Moreover, documents have been routinely destroyed after Plaintiffs have formally requested them in discovery. This does not square with the discovery rules, nor with "traditional notions of fair play and justice."

Defendant's excuse has been lack of knowledge: that it did not know the documents were relevant; it did not know the documents existed; it did not know where the documents were; and so forth. Defendant, in essence, contends that its right hand often knows not what its left hand is doing. Defendant has either made an effort to keep evidence out of the hands of Plaintiffs or it has remained willfully blind and uninformed, intending to rely on its document retention policies to avoid discovery. Either way, sanctions are appropriate.

I will instruct the jury that Defendant destroyed the voice tape and track inspection records pursuant to a document retention policy when that evidence should have been preserved, and that it may presume the voice tape and track inspection records would have been adverse to the Defendant. Plaintiffs should submit a proposed instruction by July 27, 2001, and Defendant should respond by August 3, 2001.

In addition, Defendant's actions have caused Plaintiffs to expend time and incur expenses that could have been avoided. Not only did Plaintiffs' counsel spend time attempting to locate evidence that has been destroyed, Plaintiffs' counsel have prepared a Motion for Sanctions and prepared for and presented evidence (including expert testimony) during three days of hearings. Accordingly, Defendant is ordered to pay Plaintiffs for costs incurred and time spent by Plaintiffs showing that Defendant's left hand did not know what its right hand knew.

Plaintiffs are directed to submit a detailed statement to the Court and opposing counsel by July 30, 2001, which sets forth the time spent and expenses incurred by Plaintiffs— including, but not limited to, travel expenses, telephone expenses, and deposition costs— which would not have been *necessary* had Defendant not destroyed the voice tape and track inspection records. Lost opportunity costs should not be included. Even though Plaintiffs only prevailed on two points within their Motion for Sanctions, Plaintiffs may include all their time and expenses involved in preparing the Motion for Sanctions and attendant briefs, and in presenting evidence at the hearings.

If Defendant wishes to object to specific items listed in Plaintiffs' statement, Defendant may file its objections by August 6, 2001.

## XI. Conclusion

Plaintiffs' Motion for Sanctions and Supplemental Motion for Sanctions (Doc. Nos. 111 and 132) are GRANTED in part and DENIED in part. Sanctions are imposed as noted above.

Plaintiffs' Motion for Oral Arguments by Phone (Doc. No. 191) is DENIED.

Plaintiffs' Motion to Endorse Additional Expert witnesses, Supplement Existing Opinions, and Limit Further Discovery by Defendant (Doc. No. 179) is DENIED. Based on the sanctions imposed in this order, the testimony of Brent Mower and Thomas Johnson should not be necessary at trial. If Plaintiffs disagree, a specific motion for reconsideration on this point should be filed promptly.

Defendant's Motion to Strike Affidavits of Robert L. Pottroff and Mike Easley (Doc. No. 201-1) is GRANTED. Defendant's Motion in the Alternative to Disqualify Attorneys Pottroff and Easley (Doc. No. 201-2) is DENIED.

Defendant submitted, for an *in camera* review in connection with Plaintiffs' Motion for Sanctions, cassette tapes of dispatch communications from the last ten grade crossing accidents occurring before the hearing on March 5, 2001, and recorded at the Harriman Dispatch Center. These tapes will be delivered to the Clerk's office, and the Clerk is directed to file the tapes under seal along with a copy of this Order. At the conclusion of this matter, if no appeal is taken, the Clerk may release the tapes to the Defendant at the Defendant's request.

Plaintiffs have filed a brief on the privilege Defendant has claimed to its investigative files. (Doc. No. 193). Plaintiffs' Motion to append an exhibit to that brief (Doc. No. 199) is GRANTED. Plaintiffs assert that they cannot make specific arguments without knowing the contents of the investigative files, at least in descriptive form, and request that Defendant produce a detailed privilege log. If it has not already done so, Defendant is ordered to produce a detailed privilege log by July 27, 2001. After reviewing that privilege log, if Plaintiffs believe they are entitled to the investigative files, Plaintiffs may file a motion to compel.